**SHELBY COUNTY JAIL INMATES, et al., Plaintiffs-Appellants,**

v.

**Richard W. WESTLAKE, Individually and as Sheriff of Shelby County, et al., Defendants-Appellees.**

No. 85–2050.

United States Court of Appeals, Seventh Circuit.

Argued May 13, 1986.

Decided August 20, 1986.

Michael K. Sutherlin, Indianapolis, Ind., for plaintiffs-appellants.

J. Lee McNeely, McNeely Sanders & McNeely, Shelbyville, Ind., for defendants-appellees.

Before WOOD, COFFEY and FLAUM, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

The plaintiffs filed the initial complaint in this case on May 29, 1981, seeking damages and equitable relief in their own right and as representatives of a class of inmates in the Shelby County Jail ("SCJ"). Roger Fair, Gary Pool, Harrison E. Wells, Oren Sweet, and Jack Stockton, the named plaintiffs, represented both pretrial detainees and convicted inmates serving a sentence or awaiting transfer to a state correctional facility. The plaintiffs contend that the totality of the conditions and practices at the SCJ violated their constitutional rights. More specifically, plaintiffs contend that the conditions of the SCJ amounted to punishment for pretrial detainees and cruel and unusual punishment for convicted inmates. The final amended complaint named the defendants only in their official capacities: Richard W. Westlake (Sheriff of Shelby County), the Board of Commissioners of Shelby County ("Board"), and the Shelby County Council.[1] In a bifurcated trial, the jury returned a verdict in favor of the defendants on the issue of liability. The plaintiffs raise several challenges to the judgment entered by the district court. We affirm.

I.

The plaintiffs brought their respective lawsuits pursuant to the Civil Rights Act,

---

1. The court later dismissed the Shelby County    Council as a defendant.

42 U.S.C. § 1983. Plaintiffs alleged that the conditions and restrictions of the SCJ deprived them of their First, Fourth, Eighth, and Fourteenth Amendment rights. Plaintiffs contended that the Board and Sheriff Westlake (as well as his successor Rick Isgrigg) failed to fulfill their statutory duties to oversee the SCJ, thereby depriving the plaintiffs of their constitutional rights. In particular, the plaintiffs presented evidence of the allegedly unconstitutional state of the jail classification system, jail overcrowding, the air ventilation system, the unavailability of fire exits, the lack of a sufficient number of correctional officers, the lack of proper lighting, and the lack of medical care. The plaintiffs sought damages and equitable relief. The defendants presented evidence to demonstrate that none of the problem areas pinpointed by the plaintiffs fell below constitutional requirements.

After each side had presented its case, Judge Barker instructed the jury and submitted the cases for the jury to determine whether the defendants were liable to any of the plaintiffs.[2] The jury returned separate verdicts for the defendants in each of the three cases.

The plaintiffs present four issues. First, they argue that the trial court erred by accepting a jury verdict that was contrary to the weight of the evidence. Plaintiffs then argue that the jury verdict forms did not properly define the class membership and thus allowed the jury to consider categories of inmates without reference to their date of incarceration. The plaintiffs contend that the trial court erred by not making its own findings about liability on the equity issues. Finally, plaintiffs argue that the jury instructions, taken as a whole, placed too high a burden on the inmates to establish liability.

## II.

The plaintiffs argue that there was insufficient evidence to support the jury's verdict for the defendants. Although the parties contested the numerous factual issues below, on appeal we resolve all conflicting evidence in favor of the jury's verdict, so long as a reasonable basis exists in the record to support the verdict. *See Hamilton v. Svatik,* 779 F.2d 383, 388 (7th Cir. 1985); *Spesco v. General Electric Co.,* 719 F.2d 233, 237 (7th Cir.1983) ("[T]he jury is the trier of fact and is vested with the responsibility of evaluating the evidence presented and assessing the credence of witnesses who testify."). We do not reweigh the evidence or make our own determinations of credibility. Viewing the trial court record from that perspective, we will examine each of the alleged unconstitutional conditions of the SCJ to determine whether the defendants established a reasonable basis for the jury's verdict in their favor.

### 1. Ventilation

The SCJ inmates argue that they have a right to adequate ventilation and a right to be free from extreme hot and cold temperatures. That is, of course, true. But the Constitution does not give inmates the right to be free from all discomfort. The issue with regards to ventilation is the same as with all alleged constitutional violations—does the condition amount to *punishment* of pretrial detainees or *cruel and unusual punishment* of convicted inmates. *See Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

Although the plaintiffs presented testimony which, if the jury had believed it, might have established a constitutional violation, the defendants also presented evidence, which the jury apparently believed, to show that the ventilation in SCJ was adequate. For example, William Branson,

2. The trial consolidated three claims. Monte Page McPherson, who apparently chose not to join in this appeal, filed a separate complaint, and the Shelby County Jail inmates, the appellants here, had a subclass of pretrial detainees and a subclass of post-trial detainees. The jury returned a verdict for the defendants on all three claims. We discuss only the claims of the two subclasses of the Shelby County Jail inmates.

a jail officer who later became the jail commander, testified about the jail staff's efforts to keep the plaintiffs from being subject to uncomfortable heat or cold. The plaintiffs conceded in their own testimony that in the summer months the windows were opened for cross ventilation, fans were placed in the hallways, and the inmates had unlimited access to the showers and ice for cold drinks. Walter Smith, the state's jail inspector who testified as the plaintiffs' expert, could not recall a single specific complaint from an inmate about the temperature. The defendants also presented evidence that the air movement throughout the jail was adequate, including the State Board of Health certification that the air in the jail was not harmful. The defendants' evidence clearly established a reasonable basis in the record to support the jury's verdict.

## 2. Lighting

The plaintiffs contend that they proved "that the lighting source was inadequate, caused headaches, eye irritation and was gloomy" prior to the installation of new lights in 1982. The plaintiffs also raise some questions about the appropriateness of the new lighting, but the defendants presented a great deal of evidence from which the jury could have concluded that the new lights were more than adequate. We therefore need to consider closely only the evidence of the lighting conditions prior to the 1982 changes.

The plaintiffs presented as an expert witness Walter Smith, who testified that the lighting in the jail did not meet the minimum requirement of twenty footcandles of illumination.[3] Professor Joseph Cannon testified that his inspection of the jail left him with the impression that the lighting was inadequate, especially in the cells. Several former inmates testified that the lighting gave them headaches, eye irritation, and so forth.[4] The plaintiffs presented no evidence of the number of footcandles of illumination in the jail prior to 1982.

The defendants presented Terry Surface, a Peerless Electric Company employee, who thoroughly discredited the plaintiffs' contention that less than twenty footcandles of illumination would be unconstitutional. He took several readings in Judge Barker's courtroom which revealed an intensity of seventeen footcandles in the jury box and eighteen footcandles at the judge's bench. Surface also testified that he had taken a reading of ten footcandles the night before at his kitchen table as he read the evening newspaper—a common reading for most homes. Once the defendants discredited the plaintiffs' theory that a minimum of twenty footcandles was required, the rest of the plaintiffs' evidence fell short of establishing, as a matter of law, that the lighting in the jail was unconstitutional. There was a reasonable basis in the record from which the jury could conclude that the plaintiffs failed to prove the lighting conditions violated the Constitution.

3. The plaintiffs apparently used the Indiana Jail Standards for their standard on acceptable lighting. A violation of the state's jail standard is not sufficient, in and of itself, to prove a violation of the Eighth Amendment. To adopt such a rule would discourage states from promulgating higher standards than merely preventing the cruel and unusual punishment forbidden by the Eighth Amendment. While it is the responsibility of the federal courts to ensure that jail conditions do not violate the Constitution, we do not wish to impede efforts by the states to promulgate standards for jail conditions which ensure better treatment of inmates than the minimum required by the Constitution.

4. One recurring problem for the plaintiffs was the credibility of their inmate witnesses. The defendants were able to damage the credibility of a number of the plaintiffs' witnesses by impeaching them on material matters during cross-examination, thus calling all of their testimony into question. Some of the plaintiffs' experts fared little better. For example, the cross-examination of Professor Cannon revealed that his strong opinions were based upon very little information about the actual situation at the SCJ. He was willing to voice a strong opinion that the SCJ staff was inadequately trained, but he conceded on cross-examination that he had no knowledge whatsoever of the training the staff received, nor had he made any effort to find out what training the staff received.

### 3. Indoor and Outdoor Recreation

The plaintiffs maintain that the inmates did not have a meaningful opportunity to leave their cells to engage in diversionary activities and there was no outdoor or indoor recreation program to provide the inmates with something to do. In *French v. Owens*, 777 F.2d 1250 (7th Cir.1985), we recognized that "[l]ack of exercise may certainly rise to a constitutional violation." 777 F.2d at 1255. The record reveals, however, that the inmates were provided opportunities for exercise and other diversions.

Two of the plaintiffs testified that they played cards and read books while in the jail, and one of them also testified that the jail staff allowed them board games such as Monopoly. The jail also had two exercise bikes, one in each "bullpen" area. One of the plaintiffs testified that he used the bikes while incarcerated. The staff also provided the inmates with American Medical Association booklets on indoor exercise written specifically for inmates.

Doctor Leroy Getchell, a professor of physical fitness at Ball State University where he is also Director of the Human Performance Library, testified that there was sufficient space and opportunity for the inmates to engage in an adequate exercise program. He testified that, from a fitness point of view, there was no advantage to exercising out-of-doors. Dr. Getchell concluded that the exercise bike coupled with the possibility of calisthenics provided each inmate with the opportunity to maintain the fitness level he or she had acquired prior to incarceration. Michael J. Mahoney, Executive Director of the John Howard Association, a private not-for-profit corrections reform organization, testified that the recreational facilities provided by the jail were adequate given the average length of incarceration at the jail.

■ In evaluating whether recreational opportunities are adequate, we must take into account the inmates' average length of stay. Eighty-five percent of the SCJ inmates are incarcerated ten days or less. A program which might pass muster at a jail like SCJ, where the average stay is relatively short, would not necessarily be constitutional at a prison where the inmates' average stay is a number of years. In this case, however, although the recreational opportunities were not ideal, the defendants presented enough evidence to establish a reasonable basis from which the jury could have concluded that the recreational program satisfied the Constitution. Plaintiffs maintain that it insults the inmates' intelligence to ask them to accept getting on the "exercise bike whose humming noise apparently was generally irritating to all the inmates" as a reasonable substitute for "outdoor exercise, fresh air and the sight of the world's seasonal colors," but such minor indignities are often attendant to a stay in jail.

### 4. Classification System

The plaintiffs maintain that the SCJ does not have the facilities to adequately segregate prisoners by pretrial and post-trial inmates, male and female inmates, and juvenile and adult inmates. Plaintiffs contend that even if the jail has a satisfactory classification system, the physical layout makes the necessary segregation of inmates "by sight and sound" impossible. Plaintiffs do not allege that the jail staff ever used the classification system to punish a pretrial detainee or inmate, nor did plaintiffs establish that any inmate had ever been injured by the classification system. The plaintiffs' experts evaluated the SCJ system by comparing it to their own model program, but for our purposes we need only determine whether the classification system evidenced the constitutionally mandated regard for the inmates' physical well-being. *See Benson v. Cady*, 761 F.2d 335, 338 (7th Cir.1985) (discussing *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)).

■ Both the plaintiffs' expert Walter Smith and Sheriff Isgrigg testified that males and females and juveniles and adults were segregated from each other. Both current Sheriff Isgrigg and former Sheriff Westlake, as well as Deputy Branson, the

jail commander, testified that they took reasonable steps to segregate pretrial detainees from post-conviction inmates. Brad Fisher, an expert for the plaintiffs, conceded that under certain circumstances it is not a serious misclassification to jail pretrial detainees with convicted inmates for a short period of time. The defendants presented more evidence of the adequacy of their system, but this brief recitation indicates that the jury had a reasonable basis to conclude that the SCJ classification system satisfied constitutional concerns.

■ The plaintiffs also claim the SCJ system did not adequately segregate inmates with emotional or medical problems. Both sheriffs testified that incoming inmates were screened for medical and emotional problems. Individuals with serious medical conditions were sent to the county hospital. When the jail staff believed an inmate to be suffering from some sort of mental disturbance, they contacted the jail nurse and the Gallahue Mental Health Center ("Center"). The Center provided ongoing mental health services to the jail and its inmates, including training for the jail staff on detecting mental disorders and handling emotionally disturbed inmates. Michael Parker, a psychiatric social worker at the Center, testified that the jail staff used an appropriate mental health questionnaire to screen new inmates and always followed his recommendations on mental health issues. It is clear that the defendants established a reasonable basis for the jury verdict.

### 5. Overcrowding

The plaintiffs complain that the totality of the circumstances at the SCJ including the space per inmate, the net space (less furniture, books, and so forth), the opportunity for exercise or recreation, and the quality of air and temperature control, indicate that the facilities were unconstitutionally overcrowded. *See Rhodes v. Chapman,* 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 5 (1981). Professor Joe Cannon, one of the plaintiffs' experts, testified that in his opinion inmates incarcerated for more than seven days did not have enough room.

The defendants presented evidence to rebut the plaintiffs' claims of overcrowding. Both sheriffs testified that during their tenures the jail never exceeded its capacity of forty-six inmates. Sheriff Isgrigg testified that the average jail population was between twenty and twenty-three inmates. Defendants' exhibit AM showed that between May 1, 1981, and December 1984 the jail never reached capacity and ninety-one percent of that time the jail housed thirty inmates or less.

■ A typical one-man cell was five feet by eight feet. The bullpen area (one on each floor) had approximately 612 square feet. The inmates were locked in their cells only at night between 11:00 P.M. and 5:30 A.M., and at all other times they had access to the bullpen and the picnic table area. Plaintiffs' expert Smith conceded that even under the worst scenario, with the jail at full capacity, each inmate would have 38.25 square feet of living space. Although we recognize that prison overcrowding issues are too complex to be solved by a simple per-capita-square-footage analysis, we note that in *Rhodes, supra,* the Supreme Court upheld the practice of double-ceiling inmates where each inmate had only 31.5 square feet of living space. 452 U.S. at 343, 101 S.Ct. at 2397. Many of the prisoners in *Rhodes* were confined to their small living spaces for lengthy sentences and did not have over seventeen hours each day to leave their cells; as we noted above, in the SCJ eighty-five percent of the inmates are incarcerated ten days or less and are only locked in their cells six and one-half hours a day. It is clear that the record reveals a reasonable basis for the jury's verdict that the defendants did not overcrowd the SCJ and violate the plaintiffs' constitutional rights.

### 6. Other Conditions or Practices

The plaintiffs lump together at the end of their argument a number of conclusory allegations of other alleged deficiencies of the jail, such as an alleged lack of medical

care and the practice of requiring inmates to wash their own clothes. The plaintiffs make no serious attempt to press those claims and indeed they are meritless. As for medical care, the defendants presented substantial evidence of a valid medical plan. As for the practice of requiring the inmates to do their own laundry (with laundry soap provided by the jail staff), we find that practice to fall a bit short of a constitutional violation. Plaintiffs no doubt present these other allegations to buttress their argument that the totality of the circumstances at the SCJ violate the Eighth and Fourteenth Amendments, but we find a reasonable basis in the record to support the jury's verdict that the conditions at the SCJ, individually and *in toto*, are not below constitutional standards.

### III.

The plaintiffs contend that the jury verdict forms did not define correctly the class membership and this mistake allowed the jury to consider the categories of inmates without distinguishing their dates of incarceration. The significance of the dates is that both parties concede that the SCJ was improved between the May 29, 1981, filing of the suit and the trial which began on March 11, 1985. Judge Holder[5] issued an order on December 6, 1984, listing definitions of four subclasses: pretrial detainees incarcerated at SCJ on May 29, 1981, pretrial detainees incarcerated at SCJ after May 29, 1981, post-conviction detainees incarcerated at SCJ on May 29, 1981, and post-conviction detainees incarcerated at SCJ after May 29, 1981. The jury instructions at trial (# 3 and # 4) divided the plaintiff class into two subclasses—pretrial detainees and convicted inmates.[6]

Defendants argue that plaintiffs' objection places form over substance. Instruc-

tion # 36 provided "you must consider the conditions which prevailed on or shortly before May 29, 1981, the date this lawsuit was filed, to present" and return a verdict for the plaintiffs if "under a totality of the circumstances the conditions of the Shelby County Jail amounted to cruel and unusual punishment during any of those times." Defendants argue that this instruction was sufficient to inform the jury of the proper time frame. Plaintiffs failed to tender any instruction of their own pertaining to class definition. Although Instruction # 36, read with Instructions # 3 and # 4, may well have alleviated any alleged error, we need not decide the issue because the plaintiffs have waived their right to raise it.

■ Plaintiffs had ample opportunity, both at the in-chambers conference on instructions and on the record in court, to object to Instructions # 3 and # 4. Plaintiffs failed to raise any objection. The law in this circuit is clear—a party who fails to object to an instruction waives the right to appeal. *See Spanish Action Committee v. City of Chicago,* 766 F.2d 315, 319 (7th Cir.1985); Fed.R.Civ.P. 51. Although we have acknowledged an exception for exceptional circumstances, *id.,* we find none here.

### IV.

The plaintiffs contend that the district court erred because "the court acquiesced in its role as judge of the equitable issues and deferred to the jury's findings of liability." The plaintiffs argue that even though the jury decided against them on liability for the legal claims, they are entitled to injunctive relief.

Judge Barker's order of March 29, 1985, found substantial evidence to support each of the jury verdicts in the trial. The order then determined that the equitable issues

---

**5.** Judge Cale Holder originally was assigned this case. When he died in August 1983, the case was assigned to Judge William Steckler. On May 22, 1984, the case was reassigned to Judge Sarah Barker, who presided over the case at trial.

**6.** The jury instruction provided in relevant part:

The court has also subdivided the Plaintiff class into two groups, the first consisting of those individuals incarcerated at the Shelby County Jail before they were tried and the second consisting of those inmates who have been convicted of a crime and serving their sentence in the Shelby County Jail.

concerning liability were identical to the jury issues, noting that the only difference between the legal and equitable claims was the relief sought. Because the claims were tried together and no additional evidence was adduced on the equitable claims, the judge decided that she must follow the jury's verdict on liability. *See Caputo v. U.S. Lines Company,* 311 F.2d 413, 416 (2d Cir.), *cert. denied,* 374 U.S. 833, 83 S.Ct. 1871, 10 L.Ed.2d 1055 (1963); *see also Lincoln v. Board of Regents of University System,* 697 F.2d 928, 934 (11th Cir.), *cert. denied,* 464 U.S. 826, 104 S.Ct. 97, 78 L.Ed.2d 102 (1983). In her memorandum of May 31, 1985, denying plaintiffs' motion for a new trial, Judge Barker reiterated her reasons for believing that she had not allowed the jury to preempt her proper role in deciding the equitable issues.[7] Also on May 31, 1985, Judge Barker filed a supplementary entry *nunc pro tunc* to March 28, 1985, which concluded by summarizing her holding on the equitable issues: "[T]he defendants did not maintain a pattern or custom which caused any plaintiff to be deprived of any right, privilege, or immunity secured by the Constitution and laws of the United States."

Plaintiffs apparently do not quarrel with Judge Barker's view that if there is substantial evidence to support the jury's verdict on a legal issue then the court should also apply the jury's verdict to an identical equitable issue. Plaintiffs make no attempt to distinguish *Lincoln,* the Eleventh Circuit case on which Judge Barker relied, nor do they cite any contrary authority. Plaintiffs appear to be arguing that the issues were not identical. This argument is meritless.

■ Plaintiffs try to argue that what the jury decided was that the defendants were not liable for monetary damages. They then argue that the district court should have redecided every claim raised by plaintiffs to decide whether equitable relief was warranted. This argument is meritless, because it improperly attempts to combine the separate issues of liability and relief. The jury found, as a preliminary matter, that the plaintiffs had failed to prove liability, (*i.e.,* that the defendants had violated the plaintiffs' constitutional rights). Thus, the jury never had to reach the issue of legal relief (monetary damages). Plaintiffs do not suggest a single *liability* issue on the equitable claims which was not common to the legal issues decided by the jury. Therefore, it is clear that Judge Barker did not abdicate her responsibility as judge by applying the jury's verdicts on the legal issues to identical equitable issues.

To amplify our holding briefly, we note that the record reflects, far from an abdication, a very thoughtful and responsible analysis by Judge Barker. She first reviewed the jury verdicts to ensure that "there [was] substantial evidence to support each of those verdicts … reasonable persons could have found for the defendants on all the issues of the complaints." She then determined that the legal issues and equitable issues were identical, and noted that neither party had submitted any additional evidence going only to the equitable issues. Only after reviewing the propriety of the jury verdicts, confirming that the issues were identical, and ensuring that no additional evidence needed to be considered, did Judge Barker enter judgment on the equitable issues. We therefore affirm the entry of judgments on the equitable claims.

### V.

The plaintiffs argue that several instructions given by the court incorrectly stated

---

7. Judge Barker stated:

   [T]he Court's function with respect to deciding the equitable issues of the case was not preempted by the jury's determination of the legal issues…. When there is a trial involving identical legal and equitable issues, the Court, in making its decision of the equitable issues, is bound by the jury's determination of the legal issues. Here, the Court made the threshold determination whether to accept the jury verdicts, that is, whether the jury verdicts were supported by the evidence. Having accepted the jury's verdicts, the Court was bound, in that sense, to enter judgment for the defendants on the equitable issues, because those issues were identical to the legal issues.

the law and placed too high a burden of proof on them.[8] The plaintiffs also contend that the court erred by refusing to give several of their tendered instructions.

The plaintiffs' first complaint concerns Instructions # 24 and # 26.[9] Plaintiffs argue that the basis of these instructions, *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), is inapplicable to this case and the jury should not have been required to consider whether the sheriff and the Board had engaged in a custom or practice which had the effect of law. Plaintiffs fail to cite any authority or present any legal arguments why *Monell* and the more recent *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), are distinguishable. Defendants, on the other hand, argue that the two Supreme Court cases mandate that a *Monell* jury instruction be given at trial.

In their final amended complaint, the plaintiffs sued the defendants solely in their official capacities, not as individuals. In *Monell*, the Court observed that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent...." 436 U.S. at 690 n. 55, 98 S.Ct. at 2035 n. 55. Because the governmental unit itself is implicated in a suit against public officials in their official capacities, *id.; see also Hutto v. Finney*, 437 U.S. 678, 700, 98 S.Ct. 2565, 2578, 57 L.Ed.2d 522 (1978) (attorneys' fees and costs may be collected from the governmental unit whether or not it is a named party), an instruction incorporating the requirements of *Monell* was appropriate in this case. Plaintiffs failed to tender any instruction which would have explained the requirements of *Monell* differently, and on appeal plaintiffs argue only that any type of *Monell* instruction was inappropriate. Because the plaintiffs sued the defendants solely in their official capacities as agents of the county, the trial court did not err by instructing the jury on the requirements of *Monell*.

The plaintiffs also challenge Instructions # 31, # 33, and # 34. Plaintiffs failed to object to Instructions # 33 and # 34 at trial, so they have waived their right to challenge those instructions. *See Spanish Action Committee, supra,* 766 F.2d at 319; Fed.R.Civ.P. 51. We therefore need only consider whether Instruction # 31 correctly stated the law.[10] Plaintiffs assert that the

---

8. We are disturbed by plaintiffs' attempt to buttress their case by referring to statements about the jury deliberations allegedly made by a juror to plaintiffs' counsel following the trial. The plaintiffs also referred to these alleged statements in their motion for a new trial below. As we stated in *United States v. Schwartz,* 787 F.2d 257, 261–62 (7th Cir.1986), references to the mental processes of jurors are improper and forbidden in both the district courts and on appeal.

9. Instruction # 24 provided:

In order to be entitled to recover for a violation of Title 42, United States Code, Section 1983 the plaintiffs must establish the existence of certain essential elements. Specifically, in order to recover against the defendants, each of the subclasses and Mr. McPherson must show each of the following essential elements:

(1) that there exists a pattern or custom of the defendants which has injured plaintiffs by virtue of a denial of a right, privilege, or immunity secured by the constitution and law;

(2) that some act or failure to act pursuant to such pattern or custom of the defense caused plaintiffs to be deprived of such right, privilege, or immunity; and

(3) that while in the act of depriving plaintiffs of such right, privilege, or immunity, the defendants acted under color of state law.

Instruction # 26 provided:

A *pattern or custom,* as these terms have been used, is a practice or practices of county officials that are so persistent and permanent and well settled as to have the force of law. It is not necessary, however, in order to find such a pattern or custom existed, that it be the result of formal approval through the county's official decision-making channels.

10. Instruction # 31 provided:

Mere negligence or inadvertence on the part of the county officials is not sufficient to sustain a violation of the Eighth Amendment. County officials must act in callous indifference to the dangers faced by a prisoner or intentionally inflict cruel and unusual punishment before they will incur liability for an Eighth Amendment violation.

In order to show callous indifference, plaintiffs must prove the existence of a "pervasive

trial court erred in requiring the plaintiffs to prove the defendants acted intentionally or with "callous indifference." Plaintiffs do not suggest what the proper standard is in the Seventh Circuit, although they do inform us it is well established.

The language used by the district court to instruct the jury is consistent with recent Supreme Court and Seventh Circuit law. In *Davidson v. Cannon,* — U.S. ——, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), the Supreme Court held that only "deliberate or callous indifference," not "lack of due care" (*i.e.,* negligence), is actionable under the Fourteenth Amendment. *Id.* at 670–71. *See also Daniels v. Williams,* — U.S. ——, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). There is no reason to believe that the Constitution sets a lower threshold for Eighth Amendment claims. In the leading case of *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), the Court held that a negligence tort, medical malpractice, does not violate the Eighth Amendment. 429 U.S. at 106, 97 S.Ct. at 292.

■■■ A number of recent Seventh Circuit cases have rejected a negligence standard for violations of the Eighth Amendment. *See Duckworth v. Franzen,* 780 F.2d 645, 652–53 (7th Cir.1985); *Watts v. Laurent,* 774 F.2d 168, 172 (7th Cir.1985), *cert. denied,* — U.S. ——, 106 S.Ct. 1466, 89 L.Ed.2d 722 (1986); *Benson v. Cady,* 761 F.2d 335, 339 (7th Cir.1985); *Estate of Davis v. Johnson,* 745 F.2d 1066, 1070 (7th Cir.1984). The cases have required the plaintiffs to prove deliberate or callous indifference, evidenced by an actual intent to violate the inmate's rights or reckless disregard for the inmate's rights, in order to prevail on an Eighth Amendment claim. *See Duckworth,* 780 F.2d at 652–53; *Watts,* 774 F.2d at 172; *Benson,* 761 F.2d

at 339. We conclude that Instruction # 31 accurately stated the burden of proof under both the Eighth and Fourteenth Amendments.

Finally, plaintiffs, in the part of their brief labeled "Summary of Argument," allege the district court erred by refusing "to allow instructions which delineate the statutory procedures for insuring that the jail was properly maintained and managed." Plaintiffs fail to present any legal argument why this was error.[11] We decline to make the plaintiffs' arguments for them. *See United States v. Binder,* 794 F.2d 1195, 1203 (7th Cir.1986). We merely note our previous comments concerning the relationship between the jail standards of a state and the Eighth Amendment. *See supra* note 3. The decision of the district court is

AFFIRMED.

---

risk of harm" from other inmates, and that jail officials failed to reasonably respond, knowing of that risk. A pervasive risk of harm may be established by proving that violence or sexual assaults occur with sufficient frequency that inmates are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the prob-

lem and the need for protective measures. Once a pervasive risk has been established, it must be determined whether the jail officials reasonably responded to that risk.

11. Plaintiffs identify the relevant tendered instructions for the first time in their reply brief.