960 F.2d 146
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Carl Edward HALL, Plaintiff-Appellant,
v.
David A. WILLIAMS, Warden; Toni V. BAIR, Regional
Administrator; Edward C. Morris, Deputy Director;
Randall B. Kahelski; OFFICER LAMBERT,
Defendants-Appellees.
 No. 91-6007.
 United States Court of Appeals,
Fourth Circuit.
 Argued: March 6, 1992
Decided: April 13, 1992
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Richard B. Kellam, Senior District Judge. (CA-90-1603-N)
 Argued: David Brian Goodhand, Supervising Attorney, Appellate Litigation Clinical Program, Georgetown University Law Center, Washington, D.C., for Appellant.
 Robert H. Herring, Jr., Assistant Attorney General, Richmond, Va., for Appellees.
 On Brief: Steven H. Goldblatt, Director, John B. Scanlon, Student Counsel, Lisa M. Small, Student Counsel, Appellate Litigation Clinical Program, Georgetown University Law Center, Washington, D.C., for appellant.
 Mary Sue Terry, Attorney General of Virginia, Richmond, Va., for appellees.
 E.D.Va.
 REVERSED AND REMANDED.
 Before HALL, Circuit Judge, CHAPMAN, Senior Circuit Judge, and SIMONS, Senior United States District Judge for the District of South Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 The issue presented is whether the total deprivation of out-of-cell exercise and recreation for four and one-half months following a prison riot violates the Eighth Amendment prohibition of cruel and unusual punishment.
 
 
 2
 Carl Edward Hall is appealing the grant of summary judgment in favor of the defendants, who are officers and employees of the Virginia Department of Corrections. Hall is a Virginia inmate, and on November 26, 1989, he was confined at Powhatan Correctional Center, a maximum security facility, when there was a prison riot. The entire facility was put on "lockdown" status, which confines inmates to their cells. Appellant was confined to Cell Block C-1 at the time of the riot, but was thereafter transferred to Cell Block C-2 upon recommendation of the Institutional Classification Committee (ICC).
 
 
 3
 The inmates in C-2 were on lockdown from the date of the riot until they were allowed to return to the mess hall on April 12 and to return to out-of-cell exercise on April 16, 1990. Hall brought this action under 42 U.S.C. § 1983 alleging violation of the Eighth Amendment because of the confinement to his cell for a period of four and one-half months with no out-of-cell exercise. He also claims denial of due process rights in the ICC proceedings that resulted in his transfer from C-1 to C-2 after the riot. The district court found that the selection of appropriate security measures is left to the discretion of prison officials and that the decision to lock down C-2 after the riot and the length of the lockdown were within the discretion of the defendants and did not violate any of plaintiff's constitutional rights. The district court did not address or decide the due process claim.
 
 
 4
 We hold that there were a number of disputes as to material facts on the Eighth Amendment claim and that the granting of summary judgment at this stage was error. We reverse and remand for further proceedings on the Eighth Amendment claim and also to allow the district court to consider the due process claim.
 
 
 5
 * The lockdown of Powhatan Correctional Center followed a riot or disturbance in its mess hall on November 26, 1989. This disturbance resulted in property damage and personal injuries among the staff and the inmates. A majority of the property damage occurred in Cell Blocks C-1 and C-2. The entire facility was locked down immediately after the mess hall riot. Six weeks later, all cell blocks were reopened except C-2, which remained locked down until the middle of April 1990.
 
 
 6
 The lockdown resulted in the loss of many prisoner privileges. They were denied hot meals and showers for about two weeks after the disturbance. The C-2 prisoners were not allowed to clean their cells for approximately one month and common areas of the cell block were not cleaned for about six weeks. The 140 inmates of C2 were allowed to return to the mess hall for meals on April 12, 1990, and to out-of-cell exercise on April 16, 1990.
 
 
 7
 At the time of the riot, Hall was assigned to Cell Block C-1 and contends that he was in his cell when the mess hall disturbance occurred.
 
 
 8
 On December 7, 1989, Hall was transferred to Cell Block C-2 upon recommendation of the ICC which acted upon "confidential information received from an informant that Hall had participated" in the disturbance. Hall protested his transfer and filed a series of grievances, including a demand to be seen by the ICC to discuss his placement in C-2. The ICC conducted a hearing on January 11, 1990, and a subsequent hearing on February 23, 1990, at which time Hall was cleared of the charge that he was involved in the riot. The ICC recommended that he be returned to the prison's general population, but the defendants contended that there was no bed space available, and Hall remained confined to C-2 and subject to the lockdown until mid-April 1990.
 
 
 9
 The defendants contend that the lockdown was monitored and evaluated daily and that limited activities and privileges were restored in each cell block as security concerns permitted. The prison's operating procedures provided that, if circumstances were such that less restrictive measures were not feasible because of the threat to inmates and/or staff, limitations on inmate movement and activity could be established. Under the facts surrounding this disturbance, the prison administrators determined that recreation was precluded because of security concerns. The administration also claimed that C-2 was kept locked down because problems continued in this area, i.e., inmates flooded their cells, threw objects at correctional officers and resisted attempts to bring the cell block back to normal.
 
 
 10
 Hall filed his § 1983 action pro se and in forma pauperis, setting forth the denial of out-of-cell recreation and exercise in support of his Eighth Amendment claims. He also asserted that he was transferred from C-1 to C-2 without cause and in violation of his due process rights because an ICC hearing was not held promptly and, when held, it was conducted as an investigation. He alleged that the defendants acted in bad faith in locking down all of C-2 when the warden knew that most of the prisoners in that block had nothing to do with the riot. He further claimed that the lockdown was maintained as a retaliatory measure against the inmates of C-2 because of acts that occurred prior to and unconnected with the riot. Hall supported his claims with an affidavit.
 
 
 11
 The warden denied that leaving Hall in C-2 was a retaliatory measure or a form of harassment or discrimination, but instead claimed that it was based upon security needs and the level of supervision required for individual inmates necessary to the orderly operation of the institution. He asserted that Hall remained in C-2, after the ICC recommendation, because there was no bed available to him outside C-2 at the time. The warden filed an affidavit but it does not address Hall's due process claim.
 
 II
 
 12
 Grants or denials of summary judgment are subject to de novo review. Summary judgment is to be rendered when"there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When considering summary judgment, we must view the facts in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A court must exercise great care in granting summary judgment when a party's motives or intentions are at issue. "[A] determination of someone's state of mind usually entails the drawing of factual inferences as to which reasonable men might differ-a function traditionally left to the jury...." 10A Charles A. Wright, et al., Federal Practice and Procedure § 2730, at 238 (2d ed. 1983).
 
 III
 
 13
 In Wilson v. Seiter, 111 S. Ct. 2321 (1991), the court adopted a two part test for claims of Eighth Amendment challenges to conditions of confinement. The test consists of an objective component (was the deprivation sufficiently serious?), and a subjective component (were the prison officials deliberately indifferent to the conditions?).
 
 A.
 
 14
 We turn again to Wilson v. Seiter, supra, for the answer to the objective component. In Wilson, exercise is defined as an "identifiable human need." 111 S. Ct. at 2327. It is not disputed that Hall was denied any out-of-cell exercise for almost five months, and he alleges that his cell was too small for exercise.
 
 
 15
 Prior to Wilson, the law was clear that prisoners had a constitutional right to out-of-cell exercise. In Clay v. Miller, 626 F.2d 345 (4th Cir. 1980), we held that restricting an inmate's opportunities for physical exercise could rise to the cruel and unusual punishment level, and that courts must look to the totality of the circumstances in deciding this issue. Earlier, we held that inadequate exercise may, taken alone, reach the level of cruel and unusual punishment. Kirby v. Blackledge, 530 F.2d 583, 587 (4th Cir. 1976). See also Sweet v. South Carolina Dep't of Corrections, 529 F.2d 854, 866 (4th Cir. 1975).
 
 
 16
 The duration of the exercise deprivation is an essential element in determining if there is a constitutional violation. Mitchell v. Rice, 954 F.2d 187 (4th Cir. 1992). "It may generally be considered that complete deprivation of exercise for an extended period of time violates Eighth Amendment prohibitions against cruel and unusual punishment." Id. at. Courts have considered duration in terms of days or weeks when setting a constitutional limit, but we have found no case holding that complete exercise denial for as long as four and onehalf months is constitutionally insignificant.* In cases where a prison lockdown lasted for a period of months, the courts have required prison authorities to provide inmates with exercise opportunities. In Preston v. Thompson, 589 F.2d 300 (7th Cir. 1978), the court affirmed an order requiring one hour of exercise each day for prisoners subjected to a three and one-half month lockdown, and in Jefferson v. Southworth, 447 F. Supp. 179 (D.R.I. 1978), aff'd sub nom. Palmigiano v. Garrahy, 616 F.2d 598 (1st Cir.), cert. denied, 449 U.S. 839 (1980), the court required at least one hour of recreation per day when prisoners had been subjected to a five month lockdown.
 
 
 17
 In Sweet, we observed: " 'Cruel and unusual punishment,' as used in the Eighth Amendment, ... [d]oes not draw its meaning simply from the type of punishment or deprivation imposed; it is often intimately concerned with the time covered by the punishment or deprivation and the reasonable limits of prison supervision." Sweet, 529 F.2d at 865. Hall's allegations and his affidavit make out a prima facie case (complete deprivation of exercise for four and one-half months) as to the objective component, subject of course to the defendants' rebuttal.
 
 B.
 
 18
 The subjective component defined in Wilson v. Seiter is the intent of the warden or responsible prison officials. "These cases mandate inquiry into a prison official's state of mind when it is claimed that the official has inflicted cruel and unusual punishment." Wilson, 111 S. Ct. at 2324. The subjective element requires proof of deliberate indifference by prison officials to the plaintiff's basic need for regular exercise.
 
 
 19
 In Eighth Amendment cases involving conditions of confinement, deliberate indifference may be shown when prison authorities were aware of the objectively cruel conditions and failed to remedy them. See Lopez v. Robinson, 914 F.2d 486, 490 (4th Cir. 1990); CortesQuinones v. Jimenez-Nettleship, 842 F.2d 556, 558 (1st Cir.), cert. denied, 488 U.S. 823 (1988); Morgan v. District of Columbia, 824 F.2d 1049, 1058 (D.C. Cir. 1987). "The long duration of a cruel prison condition may make it easier to establish knowledge and hence some form of intent...." Wilson, 111 S. Ct. at 2325 (emphasis in original).
 
 
 20
 The affidavits of Hall and Warden Williams create factual issues on the question of intent. There is no dispute as to the existence of the November 1989 mess hall disturbance which prompted the lockdown of the entire prison. However, there is a dispute as to the reason the warden kept all C-2 inmates on lockdown for almost five months. Hall contends that the emergency was over when all of the other cell blocks were taken off of lockdown and that it was the warden's intent to punish all of the inmates in C-2 for reasons unrelated to the mess hall disturbance, which reasons he asserts were past instances of misconduct in this cell block. Hall also contends that the warden's actions were retaliatory and designed to punish him and other C-2 residents. There were 140 inmates in C-2 and even the warden admits that only 41 were charged with offenses arising out of the riot. Keeping all 140 inmates locked down with no effort to segregate the non-offenders could be viewed as evidence of retaliation. There is a factual dispute as to whether arrangements could reasonably have been made to allow Hall, and the other 98 inmates not involved in the disturbance, to exercise out of their cells on a regular basis.
 
 
 21
 Evidence of deliberate indifference could be established by proof that C-2 was kept on lockdown long after the rest of the prison was relieved from lockdown, when this action was taken for retaliatory purposes to punish all of the inmates in C-2 for past misbehavior not connected with the November 1989 disturbance. The warden's state of mind is at issue, and his intent does not lend itself to a summary judgment determination on the present state of the record.
 
 IV
 
 22
 The district court did not address Hall's alleged due process claim arising from his transfer to C-2. In his complaint he alleged: "I was not given any I.C.C. hearing to [til?] after about a month and was told that I was being seen by the I.C.C for a possible transfer but when I did see the I.C.C. it was nothing at all about a possible tran[s]fer but more like a[n] investigation without any rights being given before hand or at the I.C.C. hearing." Hall raised this issue again in his opposition affidavit: "I Carl E. Hall was moved out of C.1 over to C.2. [T]his was did with out any I.C.C. hearing or cause on [Dec. 7,] 1989. I was locked up in C.2 cellblock for along time without cause." The defendants made no response to this claim, and it was not addressed in the order granting summary judgment. There is a question as to whether Hall had a liberty interest in not being transferred from C-1 to C-2 without proper procedures being followed. If he had a liberty interest, the procedures employed to abridge his interest must comport with the due process requirements set forth in Wolff v. McDonnell, 418 U.S. 539 (1974). Summary judgment is not appropriate when the court has not addressed a substantial claim.
 
 
 23
 Since there are disputes as to genuine issues of material fact, summary judgment was inappropriate and this case must be remanded for further proceedings. On remand, the district court shall also address the due process claim arising out of Hall's transfer from C-1 to C-2.
 
 REVERSED AND REMANDED WITH INSTRUCTIONS
 
 
 *
 See Knight v. Armontrout, 878 F.2d 1093, 1096 (8th Cir. 1989) (no violation where prisoners kept in punitive detention without exercise for 23 days); Rust v. Grammer, 858 F.2d 411, 414 (8th Cir. 1988) (no violation where yard privileges suspended for approximately two weeks); Harris v. Fleming, 839 F.2d 1232, 1236 (7th Cir. 1988) (no violation where prisoner had been denied yard and recreational time for the duration of his 28 day stay in segregation); Davenport v. DeRobertis, 844 F.2d 1310, 1315 (7th Cir.) (failure to provide inmates confined for more than a very short period with opportunity for at least five hours a week of exercise outside the cell raises serious constitutional questions), cert. denied, 480 U.S. 908 (1988); Shelby County Jail Inmates v. Westlake, 798 F.2d 1085, 1089 (7th Cir. 1986) (no violation where 85 percent of the inmates are incarcerated ten days or less); Leonard v. Norris, 797 F.2d 683, 685 (8th Cir. 1986) (no violation where prisoners denied access for 15 days in punitive isolation); Caldwell v. Miller, 790 F.2d 589, 600-01 (7th Cir. 1986) (no violation where four weeks after lockdown prisoners were permitted one hour of daily indoor exercise); Ruiz v. Estelle, 679 F.2d 1115, 1151-52 (5th Cir.) (affirming district court order mandating one hour of exercise per day for inmates confined to segregation for more than three consecutive days); aff'd in part, vacated in part, 688 F.2d 266 (5th Cir. 1982), cert. denied, 460 U.S. 1042 (1983); Hayward v. Procunier, 629 F.2d 599, 603 (9th Cir. 1980) (no violation where four weeks after lockdown prisoners allowed one hour of exercise per day), cert. denied, 451 U.S. 937 (1981); Sweet, 529 F.2d at 866 (two exercise periods for one hour each per week may not transgress Eighth Amendment standard if confined to a relatively short period of maximum confinement)