Dean PATTERSON, Plaintiff–Appellant,

v.

Stephen A. PORTCH, et al.,
Defendants–Appellees.

No. 87–2448.

United States Court of Appeals,
Seventh Circuit.

Argued April 8, 1988.

Decided Aug. 3, 1988.

John W. Williamson, Jr., Herrling Swain & Dyer S.C., Appleton, Wis., for plaintiff-appellant.

Allen D. Reuter, Clifford & Relles S.C., Madison, Wis., for defendants-appellees.

Before CUMMINGS, CUDAHY, and POSNER, Circuit Judges.

POSNER, Circuit Judge.

Dean Patterson became a tenured geography instructor at a Wisconsin state college in 1973. He was not a successful teacher, for no students enrolled in his classes in the fall of 1978, and the college administration therefore assigned him to a noninstructional project, compiling a demographic profile of the college's alumni. The project was to be done on campus. Patterson did not report to work on December 4, 1978, as he was supposed to do, and on January 18—Patterson still not having shown up—the administration sent him a letter telling him that unless he reported for work by 8:30 a.m. January 23 he would be deemed to have resigned. On January 19 Patterson wrote the chancellor, Edward Fort, that "I am willing and available to teach classes, but I refuse to accept other duties until fully cleared of all charges." Apparently by "charges" he meant students' complaints about his teaching. On January 23 he reported to work but left after a few hours without making any attempt to work on the project, instead dispatching another letter to Fort, in which he said he would not resign but added:

> I find it impossible for me to work on this campus while the charges against me are as yet unresolved. I must request that you proceed immediately with any charges still pending, and drop any

that are without substance. My name and reputation have been damaged considerably and it is seriously affecting my health and ability to work on this campus. I am willing to take a leave of absence, without pay, while these proceedings take place, because to continue to work not only demoralizes me, but also gives those who have attacked me more chances to find wrongdoing.

On February 5 Fort wrote Patterson, telling him to remove his personal belongings from the campus because "I have concluded that you did not report for work, as previously assigned, by 8:30 a.m. January 23, 1979. Therefore, as previously indicated to you in the letter [of January 18], we are treating your absence as a resignation from your position at the University as of January 23, 1979."

The next day Patterson requested a formal hearing, but this was refused. He sought review of the refusal in the Wisconsin court system. The Wisconsin Supreme Court held that the Board of Regents of the University of Wisconsin System was required to give Patterson an evidentiary hearing pursuant to section 6.02 of the Wisconsin Administrative Code to determine whether he had resigned or been fired. *Patterson v. Board of Regents*, 119 Wis.2d 570, 350 N.W.2d 612 (1984). This hearing was held, and the board decided that Patterson had resigned voluntarily and therefore had not been entitled to a hearing to determine whether there was just cause to fire him.

In 1985 Patterson brought this suit under 42 U.S.C. § 1983 against Fort in his individual capacity and by later amendment the current chancellor, Stephen Portch, in his official capacity. The suit claims that the defendants deprived Patterson of property—his tenured employment—without due process of law, in violation of the Fourteenth Amendment. Patterson seeks reinstatement with back pay plus compensatory and punitive damages. His suit also charges a denial of equal protection of the laws but this claim represents just another verbal dress for his due process claim; it is clutter, and will not be discussed further.

On cross-motions for summary judgment the district court held the following: (1) The defendants had indeed violated Patterson's constitutional rights—he had not resigned, they had fired him, and without giving him his procedural rights. (2) Fort, however, was immune from liability for damages because in 1979 the law had not been clear that "constructive resignation" was the equivalent of discharge and was therefore actionable under the due process clause. Portch was not liable for damages, either; he had had no part in the events of that year. (3) Patterson was entitled to a new hearing before Portch on whether just cause had existed in 1979 to fire him—if not, he would be entitled to reinstatement with back pay.

On the basis of these rulings, the judge ordered the action dismissed against Fort but ordered Portch to give Patterson a hearing. Portch appeals from this order, while Patterson appeals from the grant of immunity to Fort. Patterson also challenges the adequacy of the remedy that the judge gave him against Portch, contending that unless the university gives him his back pay first, the hearing will not be fair, and asking *us* to order him reinstated with back pay on the ground that this is the logical remedy for improperly terminating a tenure contract. Because Patterson—who according to his counsel was emotionally devastated by his discharge (if that is what it was) back in 1979—has held no job since, the amount of back pay has mounted up to $200,000; and counsel argues that Portch would be reluctant, by holding that Patterson had been terminated unjustly, to impose this liability on the university.

There is a threshold issue: our appellate jurisdiction. The district judge entered no Rule 58 judgment order, and at the last hearing before her, when asked by Patterson's lawyer whether the proceedings were over, said, "I plan to retain jurisdiction." When he then asked her about his right to appeal she said, "I have not entered judgment," and later she noted that the "plaintiff requested that this Court retain jurisdiction over the case to ensure that plaintiff receive the hearing contemplated under

the June 5 order. That request was granted." The order of June 5 was the order directing Portch to give Patterson a hearing.

■ The problem of deciding when an order is final and hence appealable under 28 U.S.C. § 1291, despite the absence of a formal judgment, can be a troublesome one. See, e.g., *Coniston Corp. v. Village of Hoffman Estates*, 844 F.2d 461, 463 (7th Cir.1988). Injunctions, it is true, are appealable regardless of finality, see 28 U.S. C. § 1292(a)(1), and the order to give Patterson a hearing was an injunction, not a remand, for reasons explained in *Hameetman v. City of Chicago*, 776 F.2d 636, 640 (7th Cir.1985). So we have appellate jurisdiction over Portch's appeal, and over Patterson's cross-appeal, which challenges the adequacy of the injunction entered against Portch. But that leaves the question of our jurisdiction over Patterson's appeal from the grant of summary judgment to Fort. Since this ruling ended the dispute between Patterson and Fort, the district judge could have entered a final judgment appealable under Rule 54(b) of the Federal Rules of Civil Procedure, but did not do so.

■ Because of the close legal and factual connection between the two disputes (Patterson against Fort seeking damages, and Patterson against Portch seeking reinstatement with back pay), this might seem a case for the principle that an order not itself appealable, but closely connected to an order that is appealable, may be reviewed as a pendant to the latter order. See, e.g., *Parks v. Pavkovic*, 753 F.2d 1397, 1402 (7th Cir.1985); *San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 255 (2d Cir.1984) (and cases cited there); *United States v. Ianniello*, 824 F.2d 203, 209 (2d Cir.1987). We hesitate to ground jurisdiction over Patterson's appeal on this principle ("pendent appellate jurisdiction"), however. The principle should be narrowly construed, for reasons well stated in *General Motors Corp. v. Gibson Chem. & Oil Corp.*, 786 F.2d 105, 108–09 (2d Cir.1986), and the issues in the two appeals are too distinct to make this an appropriate case for invoking it. The main issue in Patterson's appeal is

Fort's qualified immunity, and is not an issue in Portch's appeal. There is overlap between the appeals, of course, but that is not enough. We can review an unappealable order only if it is so entwined with an appealable one that separate consideration would involve sheer duplication of effort by the parties and this court. See, e.g., *Marathon Oil Co. v. United States*, 807 F.2d 759, 765 (9th Cir.1986). Any laxer approach would allow the doctrine of pendent appellate jurisdiction to swallow up the final-judgment rule.

■ There may appear to be an alternative ground for asserting jurisdiction over Patterson's appeal. A district court's retention of jurisdiction merely to supervise compliance with an order does not deprive the order of finality for purposes of section 1291. *In re Skil Corp.*, 846 F.2d 1127, 1130 (7th Cir.1988); *University Life Ins. Co. v. Unimarc Ltd.*, 699 F.2d 846, 849–50 (7th Cir.1983); *Robbins v. George W. Prescott Publishing Co.*, 614 F.2d 3, 5 (1st Cir.1980). So if Judge Crabb had retained jurisdiction merely to ensure that Portch complied with her order to give Patterson a new hearing, this retention would not deprive her order of finality, and the entire lawsuit would be wound up and all orders in it would be appealable. The absence of a Rule 58 judgment order would not be fatal, since such an order is a formality that is desirable rather than essential. *Coniston Corp. v. Village of Hoffman Estates, supra*, 844 F.2d at 463.

But that is not what happened. Judge Crabb said that "the results of that hearing [i.e., the hearing ordered in her order of June 5] will determine whether plaintiff is entitled to reinstatement or back pay." That is, she envisaged the entry by her of a further order in the event that the hearing resulted in a determination that the plaintiff had been terminated unjustifiably. This goes beyond the retention of supervisory or potential jurisdiction, and transforms her order into an interim decree. See *Peterson v. Lindner*, 765 F.2d 698, 702 (7th Cir.1985), which held that an injunction was nonfinal because "at the time Judge Gordon ruled the statutes unconstitutional

and entered an injunction, he expressly left open for future resolution such issues as the availability of damages." Cf. *In re Skil Corp., supra,* 846 F.2d at 1130. So Patterson's appeal must be dismissed.

In view of the large number of civil rights cases in which state and local employees seek relief for breaches of contract, we preface our discussion of the merits of the injunction (the only order properly before us, as we have just held) with some general reflections on the evolution of this important branch of federal jurisdiction.

When the due process clause was added to the Bill of Rights in 1789 and then to the Fourteenth Amendment in 1868, the purpose both times was to prevent government from depriving people of their life, liberty, or property except in accordance with the forms of law, which might be narrowly interpreted to mean fair procedure or broadly interpreted to include, in addition, fundamental substantive norms. See, e.g., *Coniston Corp. v. Village of Hoffman Estates, supra,* 844 F.2d at 464–65. Interpreted either way, the clause had at the outset little to do with firing public employees on grounds unrelated to those fundamental norms. Merely to break a public employee's contract of employment because of dissatisfaction with his performance would not at first have seemed a deprivation of property without due process of law.

But "property" has never had a single, fixed meaning. In the eighteenth century it had two meanings: a technical legal meaning in which it denoted (as it still does) a right protected by law against the whole world, as distinct from a contractual right, which is enforceable only against the other party to the contract (compare 2 Blackstone, Commentaries on the Laws of England 442–70 (1766), with 3 *id.* at 153–66 (1768)); and a broad political meaning in which the word denoted the fundamental entitlements upon which an individual's liberty, security, and independence depend. In contrast to Hume, a distinguished philosophical expositor of Blackstone's narrow conception, Locke, whose thinking influenced the framers of the Constitution, defined "property" as "life, liberty, and estate," The Second Treatise of Civil Government, ch. 7, § 87 (1690); see Berry, *Property and Possession: Two Replies to Locke—Hume and Hegel,* in Property: Nomos XXII 89 (Pennock & Chapman eds. 1980), and in like vein Madison said that property "embraces everything to which a man may attach a value and have a right," *Essay in Property* (1792), in 6 Madison, Writings 101 (Hunt ed. 1906). Yet the narrow meaning may have been the one intended by the framers. This is suggested by the term "private property" in the just compensation clause and by the language of the contracts clause of Article I, § 10.

Until recent times courts assumed that the narrow meaning was the correct one. See, e.g., *Taylor v. Beckham,* 178 U.S. 548, 576–77, 20 S.Ct. 890, 900–01, 44 L.Ed. 1187 (1900); *McCormick v. City of Oklahoma City,* 236 U.S. 657, 659, 35 S.Ct. 455, 455, 59 L.Ed. 771 (1915); *Bailey v. Richardson,* 182 F.2d 46, 57 (D.C.Cir.1950), aff'd by equally divided Court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1951). But by the centennial of the Fourteenth Amendment it was plain both that property in Madison's broad sense encompassed assets unknown to the eighteenth century, including expectations of public services, licenses to do various things (e.g., drive an automobile), "human capital" (e.g., earning capacity generated by education), and long-term employment contracts, and that narrow, historically confined interpretations of constitutional language were out of vogue. Yet it was hardly to be supposed that every time a state or local government deprived a person of some expectation it was guilty of violating the due process clause unless it had given him the procedural protections that are one meaning of "due process of law"; and there were at least two ways of heading off this result. One was to make an ad hoc assessment of the strength of the plaintiff's interest, and, if it was enough like a traditional property right, to classify it as property for constitutional purposes. See Williams, *Liberty and Property: The Problem of Government Benefits,* 12 J. Legal Stud. 3, 14–17 (1983).

The other was to deem the plaintiff's interest property for these purposes only if it was an entitlement under federal, state, or local law—that is, only if the law established substantive criteria for when the plaintiff could be deprived of the interest. The first approach, which the Supreme Court had flirted with in *Goldberg v. Kelly*, 397 U.S. 254, 262 n. 8, 90 S.Ct. 1011, 1017, n. 8, 25 L.Ed.2d 287 (1970), is echoed in several decisions by this court. See, e.g., *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir.1983) (treating as property "what is securely and durably yours under state [or other] law, as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain"); *Brown v. Brienen*, 722 F.2d 360, 364 (7th Cir.1983) (whether an interest is "substantial enough" to count as property for due process purposes "depends on the security with which it is held under state law and its importance to the holder"). But it has largely been supplanted by the second approach, the positivistic approach, adopted by the Supreme Court in *Board of Regents v. Roth*, 408 U.S. 564, 577–78, 92 S.Ct. 2701, 2709, 33 L.Ed. 548 (1972): property under the due process clause is any interest to which a government has given someone an entitlement. See *Fleury v. Clayton*, 847 F.2d 1229, 1231–32 (7th Cir.1988); *Archie v. City of Racine*, 847 F.2d 1211, 1225 (7th Cir.1988) (en banc) (concurring opinion); see generally Van Alstyne, *Cracks in "The New Property": Adjudicative Due Process in the Administrative State*, 62 Cornell L.Rev. 445 (1977).

This approach, dramatically illustrated by *Goss v. Lopez*, 419 U.S. 565, 573, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975), which holds that the right under state law to attend public school is a property right for federal constitutional purposes, has the advantage of simplicity, for it requires no independent judgment on what should count as property. The simplicity may be a bit delusive, though, since the substantiality of the plaintiff's interest is merely deferred to the next stage of analysis, that of determining how much process the plaintiff is due. See *Brock v. Roadway Express,*

*Inc.*, 481 U.S. 252, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987); *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976); *Brown v. Brienen, supra*, 722 F.2d at 365–66. And the approach has the disadvantage of divorcing the due process clause from its history and purpose. If the city dogcatcher is covered by civil service rules, he has a property right in his job and may not be fired without a hearing that satisfies federal standards of due process, even if the reason for firing him (that he didn't catch his quota of stray dogs last month) has nothing to do with any substantive value protected by the Constitution. It is not transparently clear why the Constitution should require this result and why in consequence civil servants should have greater employment rights than their counterparts in the private sector even when the work is identical. If Dean Patterson had been a tenured instructor at Marquette University rather than at the University of Wisconsin he could not have brought a federal suit to complain about the events that resulted in his termination.

■ The continued appropriateness of using federal courts to resolve run-of-the-mine contract disputes between public employees and their employers may deserve fresh consideration by the Supreme Court, but at our level the issue is foreclosed. The approach of cases like *Goldberg, Reed,* and *Brown* may remain valid in determining whether certain trivial, exiguous, or ephemeral entitlements are of constitutional dignity, see, e.g., *Yatvin v. Madison Metropolitan School District*, 840 F.2d 412, 417 (7th Cir.1988), but it cannot be used in a case where the plaintiff has a tenure contract. Patterson had a property right in his tenured instructorship and he could not be deprived of it without due process of law.

■ But was Patterson deprived of his employment? To put this differently, was he fired or did he resign? To answer these questions requires distinguishing among four separate forms of job termination. First, of course, is *outright discharge.* Second is *coerced resignation,* illustrated

by the allegation in *Watkins v. Milwaukee County Civil Service Comm'n*, 88 Wis.2d 411, 276 N.W.2d 775 (1979), that the plaintiff's superior had forced him to resign by threatening to file criminal charges against him if he refused. Third (perhaps a variant of second) is *constructive discharge*, where the employer makes life so unbearable for the employee that the employee resigns. Like coerced resignation, constructive discharge is treated in law as the equivalent of outright discharge (see, e.g., *Parrett v. City of Connersville*, 737 F.2d 690, 694 (7th Cir.1984)), for reasons too obvious to dwell on.

■ The fourth form of discharge, *constructive resignation*, is trickier. Normally used to refer to situations in which the employee abandons (without formally resigning) his job and the employer treats the employee as if he had formally resigned, it is well illustrated by *Dies v. City & County of Denver*, 174 Colo. 217, 483 P.2d 378 (1971). A police officer was recalled to military service during the Korean War. After the war he remained in the service for another seven years to qualify for a pension. He then sought reinstatement to the police force on the ground that he had been on leave of absence. The court held that by remaining in the military service after his obligation to serve had expired, Dies had resigned from the police force.

■ Wisconsin has a statutory provision on abandonment, see Wis.Stat. § 230.34(1)(am), but the parties agree that it does not apply to tenured faculty members, and in any event it contains procedural requirements not satisfied here. However, Wisconsin may also have a common law concept of constructive resignation. Compare *Herbert v. State Oil & Gas Board*, 287 Ala. 221, 250 So.2d 597 (1971). For in its decision reviewing Patterson's discharge, the Wisconsin Supreme Court left open the question whether he had been fired or had resigned, notwithstanding the inapplicability of the statutory provision on abandonment. See *Patterson v. Board of Regents, supra*, 119 Wis.2d at 587, 350 N.W.2d at 618. Since Patterson did not think he had resigned, the court must have

been alluding to a concept of constructive resignation. Yet the facts seem to belie such a characterization. They suggest that Fort was seeking to circumvent the cumbersome procedure prescribed in Chapter 4 of the University of Wisconsin Statutes for discharging a tenured member of the faculty. Not only are there elaborate procedural guarantees, involving various stages of review, but the faculty member's "salary shall continue until the board [the University's Board of Regents] makes its decision as to dismissal." The defendants' counsel speculated at argument that the reason Fort had treated Patterson as having resigned was that he thought it outrageous that Patterson should continue to draw his salary when he was refusing to do any work. Yet this "outrage" is contemplated by the University's statutes. Although, "pending the final decision as to his/her dismissal, the faculty member shall not normally be relieved of duties," the chancellor can make an exception if he "finds that substantial harm to the institution may result if the faculty member is continued in his/her position"—but the faculty member's salary is continued until the board's decision. Anyway Patterson offered to take a leave without pay, and the offer was declined.

The Justices of the Wisconsin Supreme Court, rather than we, are the authoritative expositors of Wisconsin law, and if they think Patterson may have resigned rather than have been discharged we have no authority to say them nay. But that determination does not conclude the question whether the termination of his employment was a deprivation in a constitutional sense. If Fort had ordered Patterson to resign at gunpoint, and the Wisconsin courts called his resignation voluntary, we would not be bound by their determination in deciding whether he had been deprived of his property right in his job.

■ If an employee does resign voluntarily, there is no deprivation and so no right to a hearing. This must also be true of at least some forms of "constructive resignation"—death, for example. But the term is not a talisman, and the employer is

not allowed to impose unreasonable conditions on an employee and then intone "constructive resignation" when the employee fails to comply with them. Cf. *Zike v. State Personnel Board*, 193 Cal.Rptr. 766, 770, 145 Cal.App.3d 817, 823–24 (1983). Suppose that Fort had told Patterson that he must report by such-and-such a date for work on a project cleaning the college's toilets, and that when Patterson didn't show up Fort told him he had resigned. On such facts constructive resignation would merge into constructive discharge, which as we have noted is equated for constitutional purposes to firing. The only difference is that in the constructive discharge case the employee takes the initiative in resigning. That is no reason for giving him *more* rights than the employee who is told, "you've quit [without knowing it]."

Patterson made clear that he did not want to resign; at most he was willing to take a leave without pay. The case is complicated however by the fact that the only, and seemingly a reasonable, condition imposed on Patterson was that he show up for work that was neither demanding nor degrading. The *Herbert* case, cited above, is factually similar, and treats the employee's refusal in such circumstances as a voluntary abandonment of employment. See 250 So.2d at 602. We are unwilling to hold that constructive resignation is never possible for a tenured public employee. We may assume, in accordance with the *Dies* case cited earlier, that if Patterson had defected to the Soviet Union, Fort could have treated this as an abandonment of employment, equivalent for constitutional purposes to a voluntary resignation and therefore not requiring a hearing.

But we are not disposed to quarrel with Judge Crabb's finding that Fort's conduct is more accurately characterized as discharging an employee over an employment dispute than as declaring the resignation of an employee who simply had abandoned his employment or not shown up for work. Patterson was a teacher by training and profession, had been hired as a teacher, and was abruptly shifted to a nonteaching job on grounds of inadequacy as a teacher. He felt that this shift imperiled his career, was unjustified, and indeed in the circumstances was stigmatizing. He did not concede Fort's authority to remove him from his teaching position. It is not just a case of an employee who fails to return from vacation or walks off the job—or so at least the district court could conclude.

But Patterson is not entitled to equitable relief beyond the very modest injunction issued by the district court. Admittedly there is much common-sense merit to his argument that he cannot expect to receive an impartial hearing from Fort's successor, who would make Fort and the university look foolish if he reinstated Patterson with back pay. (This factor is not present where, as in *Duchesne v. Williams*, 849 F.2d 1004 (6th Cir.1988), the hearing occurs before termination—before, that is, any back pay can have accrued.) We do not want to prejudge the outcome of the hearing, or to deny the possibility that the hearing may have some healing effect even if it does not lead to any tangible relief for Patterson, but we certainly agree with him that a new hearing before one of the defendants was not an adequate remedy for the violation of his rights. But neither would an order reinstating him—the order he seeks from us—be a proper remedy. Although his procedural rights were violated, there is little doubt that he was unfit in 1979, and he is less fit today. His own lawyer described Patterson as an emotional basket case. A man apparently in his late forties (his lawyer's estimate—his age is not in the record), he has not worked for the last nine years. His inability to attract students to his classes, his insistence on a formal proceeding to resolve nonexistent charges against him, his refusal to accept substitute employment at his college with no diminution of pay or perquisites and no onerous working conditions—all suggest that the college had cause to dismiss him in 1979. In light of

that it would be inappropriate for a federal court to order him reinstated, not only because it would make him better off than he would be if the college had never violated his rights, see *Bibbs v. Block*, 778 F.2d 1318, 1322 (8th Cir.1985) (en banc), but also because the appropriateness of an equitable remedy is determined by current rather than past conditions, see, e.g., *Davenport v. DeRobertis*, 844 F.2d 1310, 1313–14 (7th Cir.1988). If Patterson is unfit today, as his counsel conceded and indeed emphasized, it would be a cruelty to him and a disservice to the students to reinstate him. Cf. *Ireland v. Shultz*, 829 F.2d 1189, 1192 (D.C.Cir.1987).

 With reinstatement inappropriate for the reasons stated, Patterson's damages claim against Fort assumes particular importance. The purpose of an award of compensatory damages in a civil rights tort case as in any other tort case is to put the plaintiff in the position he would have occupied had the defendant not committed the tort. See *Carey v. Piphus*, 435 U.S. 247, 253–54, 98 S.Ct. 1042, 1046–47, 55 L.Ed.2d 252 (1978); *Memphis Community School District v. Stachura*, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986); *Lossman v. Pekarske*, 707 F.2d 288, 290 (7th Cir.1983). As we have just seen, it is extremely unlikely that, even if Fort had followed the University's statutes to a T, Patterson would be employed by the college today. Fort would have instituted a proceeding to dismiss Patterson and the outcome of that proceeding would have been dismissal. All Patterson lost *as a result of the constitutional violation* was his salary between the day that Fort terminated him and the day on which his dismissal would have taken effect had Fort followed the prescribed procedures. That loss (perhaps zero given Patterson's request to be placed on leave *without pay*), plus the monetary equivalent of any "mental and emotional distress actually ... caused by the denial of procedural due process itself," *Carey v. Piphus, supra*, 435 U.S. at 263, 98 S.Ct. at 1052—which in this case, however, might be significant—minus so much of the loss as might have been averted by reasonable efforts to mitigate damages, constitutes the damages that Patterson would be allowed to recover from Fort. See *City of Chicago v. U.S. Dept. of Labor*, 737 F.2d 1466, 1471–72 (7th Cir.1984); *Patkus v. Sangamon–Cass Consortium*, 769 F.2d 1251, 1265 (7th Cir.1985); *Kendall v. Board of Education*, 627 F.2d 1, 6 (6th Cir.1980); *Stein v. Board of City of New York*, 792 F.2d 13, 18–19 (2d Cir.1986).

We have gone through these points to make clear that the denial of effective, or any, equitable relief need not leave an employee who has been discharged unconstitutionally remediless. But whether Patterson is in fact entitled to damages from Fort, or whether as Judge Crabb held his claim for damages is barred by the doctrine of qualified immunity, which as currently understood forbids an award of damages against a public official unless the conduct giving rise to the claim of damages violated a principle of law clearly established at the time he acted, see, e.g., *Anderson v. Creighton*, —— U.S. ——, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987); *Akins v. Board of Governors*, 840 F.2d 1371, 1376 (7th Cir.1988), is an issue that we are prevented from considering, because, as explained earlier, we have no jurisdiction over Patterson's appeal from the dismissal of his damages claim.

The injunction issued by the district court is affirmed; the appeal from the dismissal of the damages claims is dismissed.