**WINDY CITY MEAT CO., INC., Petitioner,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Respondent.**

No. 90–1519.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 6, 1990.

Decided March 5, 1991.

Daniel T. Hartnett, Silets & Martin, Chicago, Ill., for petitioner.

Joe Pembroke, Ellen R. Hornstein, Dept. of Agriculture, Office of the General Counsel, Washington, D.C., for respondent.

Before WOOD, Jr., CUDAHY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

Windy City Meat Company (Windy City) is a meat processing and packaging operation on the south side of Chicago. Windy City's founder and president, Seymour Sacks, and a former plant supervisor, Rich-

ard Rudnicki, received convictions for illegal payments to meat inspectors and graders revealed by an undercover Department of Agriculture (USDA) investigation.

Federal meat inspection and grading statutes and the USDA's rules pursuant to them provide that a company receiving federal inspection and grading services may, following a hearing, lose such services if an employee remains with the company after conviction for certain types of felonies. The Judicial Officer (JO) of the USDA has supplemented this framework with a *per se* rule requiring administrative law judges hearing withdrawal proceedings to view a bribery-related conviction of a responsible employee as adequate reason—having no regard to mitigating circumstances—to withdraw inspection and grading services permanently. An ALJ reviewed Windy City's fitness under this *per se* rule and withdrew services; in the alternative, the ALJ also held that withdrawal was justified after consideration of potentially mitigating circumstances. The JO affirmed the holdings.

On appeal, Windy City seeks reversal on the bases that the *per se* rule circumvents the requirement of a meaningful hearing under federal meat and poultry inspection laws, that the *per se* policy taints the Department's "independent" determination of any mitigating circumstances and that the *per se* rule denies the Company's due process rights. The USDA argues that the *per se* rule is within the discretion permitted by the statute, that the Department's non-*per se* analysis provides an independent rationale for denying inspection services and that the hearing afforded Windy City meets due process requirements under the Constitution, *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and the Administrative Procedure Act.

Although we are concerned that application of the *per se* rule may deny due process, we do not find that the rule tainted the ALJ's otherwise independent consideration of Windy City's mitigating circumstances. On the basis of the ALJ's consideration of these circumstances, we think that the Department's decision meets the substantial evidence test and affirm the agency's decision, although we question the validity of the *per se* rule in other conceivable contexts.

## I.

The history of Windy City Meats is the history of its founder and president, Seymour Sacks. Sacks founded the business in 1977 and is, by all accounts, the Company's financial, policy-making and administrative authority. Tr. at 140, 195–96, 203 (testimony of S. Sacks and J. Sacks). He also provides the financial backing of Windy City, personally guaranteeing credit arrangements and embodying the authority required by creditors, suppliers and customers. Tr. at 139, 142–44, 201, 205 (testimony of S. Sacks, J. Sacks). Both a wholesaler and retailer of meat products, Windy City primarily processes pork bellies into salt pork, bacon, ham and smoked items. The Company operates in an economically depressed area on Chicago's south side and employs 65–70 workers, approximately 17–20 of whom work in meat processing. Three of Sacks's sons also work for the business.

For Windy City and for all meat producers, federal or state inspection and grading are either required by law or essential for conducting business. Inspection ensures the safety of meat transmitted from processor to purchaser and grading ensures that the product meets the specifications of the sales contract. Tr. at 55, 89 (testimony of E. Martin, D. Gonzales). Once meat products are processed or packaged, it is impossible to determine their composition or whether they measure up to specifications. Tr. at 89 (testimony of D. Gonzales). Windy City first qualified for federal meat inspection in 1977 and poultry inspection services in 1982, and most of the Company's grading services were required for sales to Illinois hospitals and other state institutions. Tr. at 115, 152 (testimony of S. Sacks). The Company stopped using federal grading services in 1985, Tr. at 161 (testimony of S. Sacks), but mandatory inspection services continued to the time of the fitness determination.

Legal hard times befell Windy City in the early 1980's after a USDA investigation revealed improper payments to federal inspectors and state graders. As part of the USDA undercover investigation, from April 24 to May 30, 1984, Daniel Gonzales, an experienced federal meat grader, worked at Windy City while posing as a rookie and using a pseudonym. He was wired for sound. Recorded conversations confirmed suspected illegal payments. On May 8, 1984, Sacks called Gonzales into a private office and offered him an extra $25.00 per day while he was in the plant; total payments eventually reached $150–200.[1] Tr. at 156 (testimony of S. Sacks). Plant supervisor Rudnicki offered Gonzales free lunches and snacks, free meat and free tickets to a ball game. Tr. at 86 (testimony of D. Gonzales). Gonzales also received permission to pad his time sheet from time to time. Id.

Other instances of illegal conduct also surfaced. On February 3, 1984, Sacks paid Alvia James, a federal meat grader, to induce him to certify and grade meat that he had not examined. Tr. at 149–50 (testimony of S. Sacks). On February 8, 1984, Rudnicki gave James fifteen pounds of meat for the same purpose. While the precise scope of the bribery operations is somewhat unclear, Sacks admitted to paying several federal graders and one state inspector with money or meat, in addition to the acts revealed by the undercover operation. Tr. at 164–65 (testimony of S. Sacks). Sacks testified that the bribes were necessary to induce at least the graders to perform their assigned grading duties, Tr. at 145–50 (testimony of S. Sacks), but he also admitted that he did not

take any action to secure performance of duty through lawful, official channels. Id.

On November 30, 1987, Sacks and Rudnicki received convictions in the Eastern District of Illinois. Sacks was convicted of knowingly, willfully and unlawfully giving a thing of value to a meat grader for official acts, 18 U.S.C. § 201(f) (1982) (now 18 U.S.C. § 201(c)(1)(A) (1988)), and of mail fraud, 18 U.S.C. § 1341 (1988). Rudnicki was convicted of knowingly, willfully and unlawfully supplementing the salary of a federal meat grader, 18 U.S.C. § 209(a) (1988). Rudnicki has since left the firm and his role was not part of the subsequent fitness inquiry.

The USDA initiated an administrative proceeding to review Windy City's fitness in light of the felony convictions. During the proceeding, family members, business associates and community members attested to Sacks's good reputation, ethical character, reformed attitude and importance to the business, as well as to Windy City's importance to the surrounding neighborhood's residents and businesses. The ALJ also heard evidence of Sacks's cooperation with the USDA in the wake of the undercover operations. Tr. at 156, 164–65 (testimony of S. Sacks). Several witnesses testified that Windy City would likely close if inspection services were withdrawn.

The ALJ's decision of May 26, 1989, withdrew inspection services indefinitely from Windy City and companies affiliated with its principal employees and withdrew meat grading and acceptance services for ten years.[2] Windy City appealed the decision to the JO of the Department of Agriculture, who has final administrative authority

---

1. While admitting the payments, Sacks has argued that he did not authorize and would never permit practices which would have threatened the safety or quality of the meat processed at Windy City. He uses as support some of the conversations recorded by wiretap. For example, one recorded conversation includes this statement by Sacks:

I'm not going to do anything wrong because it would make a problem for me as well as you. Whatever goes into that box is right, but sometimes we sidestep, you know, all the chickenshit stuff. So starting tomorrow, I'll do that for you, but I'll tell you everything that goes in that box is gonna be right.

USDA's Hearing Exhibit 7 (transcript of tape recording); see also Tr. at 101 (testimony of D. Gonzales).

2. The penalty provision of the order provides:

Inspection services as required pursuant to the Federal Meat Inspection Act (FMIA), and the Poultry Products Inspection Act (PPIA), are immediately and indefinitely withdrawn from and denied to respondent, its officers, directors, employees, successors, assigns and affiliates, directly or through any corporate or other device, or any establishment where respondent has authority with respect to the establishment, or with respect to any livestock

under the Secretary, 7 U.S.C. §§ 450c–450g (1988); 7 C.F.R. § 2.35 (1990), for adjudications conducted pursuant to 5 U.S.C. §§ 556, 557 (1988). On January 30, 1990, the JO, after denying Windy City an oral hearing, issued his Decision and Order, which incorporated the ALJ's findings of fact, conclusions and sanctions. The opinion holds that the bribery convictions justify denial of inspection and grading services under the *per se* rule and, in the alternative, that the ALJ properly considered mitigating circumstances and concluded that they do not overcome the Company's unfitness as demonstrated by the bribery offenses. *In re Windy City Meat Co.*, Decision and Order (Jan. 30, 1990), at 17–18 (reproduced in Petitioner's Br., app. at 17–18). This appeal followed.

## II.

Three federal statutes provide for federal meat and poultry inspection, grading and acceptance services: the Federal Meat Inspection Act, 21 U.S.C. §§ 601–695 (1988) (FMIA), the Poultry Products Inspection Act, 21 U.S.C. §§ 451–470 (1988) (PPIA) and the Agricultural Marketing Act of 1946, 7 U.S.C. §§ 1621–1629 (1988) (AMA).[3] Under these acts the federal government administers inspection services, labeling requirements, marketing controls and other health and safety constraints on the meat processing industry.

The Acts also provide for withdrawal of inspection services under certain conditions. The FMIA authorizes the USDA to withdraw services when a responsible employee is convicted of certain offenses, including "any felony."[4] The PPIA permits withdrawal for similar offenses, including various felonies.[5] Under this statutory authority, the Department of Agriculture makes determinations of unfitness to receive federal meat inspection services.

or product(s) in which respondent has a contract or other financial interest.

Further, the benefits of meat grading and acceptance services, as described by the Agricultural Marketing Act (AMA) are immediately withdrawn and denied for a 10–year period to respondents [sic], its officers, directors, employees, successors, assigns and affiliates, directly or through any corporate or other device, or any establishment where respondent has authority with respect to the establishment, or with respect to any livestock or product(s) in which respondent has a contract or other financial interest.

*In re Windy City Meat Co.*, Consolidated Initial Decision (May 26, 1989), at 20 (reproduced in Petitioner's Br., app. at 39).

3. As the government's brief indicates, the AMA does not provide for direct review of the Department's orders by the courts of appeals. The order in this case arises from a consolidated proceeding before the Secretary to withdraw services under all three acts. Pendent jurisdiction provides for review of the AMA portion, since this part of the order is critical to determining the validity of the portions for which appellate jurisdiction is provided. *Patterson v. Portch*, 853 F.2d 1399, 1403 (7th Cir.1988).

4. The statute provides:
(a) The Secretary may (for such period, or indefinitely, as he deems necessary to effectuate the purposes of this chapter) refuse to provide, or withdraw, inspection service ... with respect to any establishment if he determines, after opportunity for a hearing is accorded to the applicant for, or recipient of, such service, that such applicant or recipient

is unfit to engage in any business requiring inspection ... because the applicant or recipient, or anyone responsibly connected with the applicant or recipient, has been convicted, in any Federal or State court, of (1) more than one violation of any law, other than a felony, based upon the acquiring, handling, or distributing of unwholesome, mislabeled, or deceptively packaged food or upon fraud in connection with transactions in food or (2) any felony.

21 U.S.C. § 671(a) (1988).

5. The statute states that:
(a) The Secretary may (for such period, or indefinitely, as he deems necessary to effectuate the purposes of this chapter) refuse to provide, or withdraw, inspection service under this chapter with respect to any establishment if he determines, after opportunity for a hearing is accorded to the applicant for, or recipient of, such service, that such applicant or recipient is unfit to engage in any business requiring inspection upon this chapter because the applicant or recipient or anyone responsibly connected with the applicant or recipient, has been convicted, in any Federal or State court, within the previous ten years of (1) any felony or more than one misdemeanor under any law based upon the acquiring, handling, or distributing of adulterated, mislabeled, or deceptively packaged food or fraud in connection with transactions in food; or (2) *any felony, involving fraud, bribery, extortion, or any other act or circumstances indicating a lack of the integrity needed for the conduct of operations affecting the*

Withdrawal of services under the AMA is governed by the Agency's 1979 rule which provides that grading and acceptance services may be withdrawn for giving something of value to meat inspectors.[6]

In 1979 the JO announced that the Department would seek the strongest possible sanction—withdrawal of services—whenever recipients of inspection services are involved in bribery-related offenses.[7] This *per se* rule has been reiterated in an adjudicatory proceeding:

> Where the health of the public is at stake, the only responsible course of action is for USDA to pursue a hard-nosed, *per se* approach, under which any plant is determined to be unfit to receive inspection so long as a person who has been convicted of bribery or a related offense involving the inspection or grading staff remains associated with the plant.
>
> Adopting such a *per se* approach, or approving such a *per se* approach, involves making a choice between the economic interest of the criminal and the health and welfare of the United States public. I believe that the decision should be made in favor of fully protecting the public interest.

*In Re Great Amer. Veal Co.*, 45 Agric.Dec. 1770, 1784–85 (1986).

The *per se* rule's purpose is to maintain purity in the meat-packing industry and the public's confidence in the integrity of meat inspection services.[8] The practical effect

---

*public health.* For the purpose of this paragraph a person shall be deemed to be responsibly connected with the business if he was a partner, officer, director, holder, or owner of 10 per centum or more of its voting stock or employee in a managerial or executive capacity.

(b) Upon the withdrawal of inspection service from any official establishment ... the applicant for, or recipient of, the service shall, upon request, be afforded opportunity for a hearing with respect to the merits or validity of such action; but such withdrawal or refusal shall continue in effect unless otherwise ordered by the Secretary.

21 U.S.C. § 467(a)-(b) (1988) (emphasis added).

**6.** The rule provides in relevant part:

(a) *For misconduct—*

(1) *Bases for denial or withdrawal.* An application or a request for service may be rejected, or the benefits of the service may be otherwise denied to, or withdrawn from, any person who, or whose employee or agent in the scope of his employment or agency: ...

(ii) has given or attempted to give, as a loan or for any other purpose, any money, favor, or other thing of value, to any employee of the Department authorized to perform any function under the regulations....

(2) *Procedure.* All cases arising under this paragraph shall be conducted in accordance with the rules of practice governing withdrawal of inspection and grading service under the Agricultural Marketing Act of 1946 as contained in Part 2850 of this chapter and/or the Rules of Practice Governing Formal Adjudicatory Administrative Proceedings Instituted by the Secretary as contained in 7 CFR Part 1, Subpart H, as applicable.

7 C.F.R. § 54.11 (1990).

**7.** The announcement:

The policy of [the Department's Food Safety and Quality Service] in administrative actions brought for the withdrawal or denial of Federal inspection and/or grading and acceptance services, based upon convictions for bribery and related offenses, shall be as follows: *FSQS shall institute an administrative proceeding seeking the indefinite withdrawal or denial of Federal inspection and/or grading and acceptance services from any recipient of or applicant for such services when the Department's action is based upon a criminal conviction or convictions for bribery or related offenses.* FSQS will also exercise its authority, whenever it is deemed appropriate, to institute action to withdraw the benefits of such grading and acceptance services from individuals, as well as business entities, convicted of such crimes. Such proceedings shall be conducted in conformity with the applicable Rules of Practice, which afford the respondent the opportunity for a hearing before an Administrative Law Judge. Decisions rendered in such proceedings may then be appealed to the Judicial Officer of the Department, whose decisions may, in turn, be appealed to the Federal courts.

44 Fed.Reg. 37322, 37333 (June 26, 1979) (emphasis added).

**8.** The agency's explanation of the *per se* rule:

Recently, many of the Department's [inspection withdrawal] actions ... have been based upon criminal convictions obtained against federal inspected establishments and/or against individuals responsibly connected with such establishments for bribery and related offenses such as the giving of unlawful gratuities to public officials. In addition to evidencing a lack of basic integrity, such convictions must be considered especially serious in the specific context of the meat and poultry industries. While the FMIA, PPIA, and [Egg Products Inspection Act] require the mandato-

of the *per se* rule is that a conviction for bribery or attempted bribery may permit the agency to deny inspection and grading services indefinitely without consideration of mitigating circumstances. The USDA does, however, also require ALJs to assess the recipient's fitness independent of the *per se* rule and to include these findings in fitness determinations.[9]

### A. *Validity of the* Per Se *Rule*

█ Petitioner argues that the *per se* rule exceeds the USDA's authority under the FMIA, PPIA and AMA by restricting too narrowly the factors which an ALJ considers in fitness determinations. Under the statutes, Windy City argues, a felony conviction can serve only as rebuttable *evidence* at the fitness determination hearing, and the JO exceeds the statutory mandate by making a conviction the controlling, determinative factor. In short, the argument is that the *per se* rule eliminates the meaningfulness of the fitness hearing. In response, the USDA argues that a "hearing" is a flexible concept not rendered meaningless by the *per se* rule and that the *per se* rule is within the limits of statutory language.

We first examine an important Eighth Circuit case that held the *per se* rule invalid because the statutory guarantee of a hearing implies that certain felony offenses ought not automatically disqualify a business from meat inspection services.

Section 671(a) is not a mandatory provision that directs the USDA to deny inspection services automatically to any meatpacking firm employing a convicted felon in a position of responsibility. Instead, the statute authorizes the USDA to refuse inspection services if the agency determines that the felon's connection to the firm renders it unfit to engage in the meatpacking business. To reach this determination, the agency must form a judgment about the nature of the employee's offense, including any mitigating circumstances, and the extent to which this past criminal conduct threatens the objectives of the Federal Meat Inspection Act.

*Chernin v. Lyng,* 874 F.2d 501, 504 (8th Cir.1989) (citing *Utica Packing Co. v. Block,* 781 F.2d 71, 74, 78 (6th Cir.1986), and *Wyszynski Provision Co. v. Secretary of Agriculture,* 538 F.Supp. 361, 364 (E.D. Pa.1982)). While somewhat persuasive, *Chernin* differs from the current case in three ways. First, the felony convictions at issue in the present case involved bribes of federal meat inspectors, offenses at the heart of the federal interest in ensuring safe and accurately graded meat. *Chernin,* on the other hand, involved a felony

---

ry inspection of the slaughtering of certain livestock and poultry and processing of products thereof, and of the processing of egg products, it is physically impossible for Federal inspections personnel to oversee all actions taken by operators and employees of federal inspected establishments. Great reliance must, therefore, be placed upon the integrity of these individuals. Similar reliance must be placed upon the integrity of those involved in the grading process operated under the AMA in order to insure that grading decisions are as accurate as possible and that consumers are accurately informed of the proper grades of products. When such criminal convictions are based upon the giving or offering of bribes or gratuities to Federal inspection or grading personnel, such actions also pose a direct and tangible threat to the integrity of the inspection and grading systems. The Department has recognized the seriousness of such offenses in dealing with its own personnel, who have been subjected to immediate suspension without pay upon being charged

with such offenses, and have been dismissed based upon the conviction for such offenses.

.     .     .     .     .

... FSQS is aware that its application may have substantial impact upon affected individuals and establishments. However, after a full consideration of this issue, it has been determined that the institution of such a policy on a uniform basis is essential in order to protect the integrity of Federal Meat Inspection, Poultry Products Inspection, and Egg Products Inspection Programs, and the Federal Meat, Poultry, Egg, Dairy, Fruit, and Vegetable Grading and Acceptance Services.... The intended effect of the adoption of such a policy will be the enhancement of the integrity of the industry and the Federal programs, and the deterrence of bribery and related offenses in the future.

44 Fed.Reg. 37,322, 37,323 (June 26, 1979).

**9.** This Department policy was the result of non-acquiescence in the Sixth Circuit's invalidation of the *per se* rule. *See In Re Great Am. Veal Co.,* 45 Agric.Dec. 1770, 1850 (1986).

conviction arising from a fraudulent accounting scheme at a previous meat packing job, 874 F.2d at 502, which may merely raise questions about the business's fitness to receive inspection services.

Second, the petitioner Chernin did not have the opportunity to participate in the proceedings that determined his fate. The USDA and Chernin's former employer entered a consent decree that ensured Chernin would not be involved in the business, which the court held to violate Chernin's due process rights. In contrast, Sacks participated fully in the administrative hearing, having ample opportunity to present mitigating circumstances and to explain why Windy City should not be denied inspection services.

Third, *Chernin* addresses primarily the process due when an "unfit" employee is terminated, whereas other federal cases have more closely examined the substantive grounds for USDA determinations. *See Utica Packing Co. v. Block,* 781 F.2d 71, 74 (6th Cir.1986) ("The more closely the conduct strikes to the policies of the Federal Meat Inspection Act, the more likely it alone will support a determination of unfitness regardless of the mitigating circumstances present.") (quoting with approval previous unpublished opinion; citations omitted); *Wyszynski Provision Co. v. Secretary of Ag.,* 538 F.Supp. 361, 364–65 (E.D.Pa.1982) (mitigating facts accorded little or no weight because of seriousness of felony conviction); *Toscony Provision Co., Inc. v. Block,* 538 F.Supp. 318, 320–21 (D.N.J.1982) (convictions for distributing adultered meat adequate by themselves for withdrawal under discretion permitted by statute), *aff'd,* 782 F.2d 1031 (3d Cir.1986) (table). We therefore have difficulty relying on *Chernin* as effective precedent because Sacks received an adequate hearing (discussed below) and because the offense struck close to the heart of the inspection and grading statutes.

But neither do we find entirely persuasive the government's defense of the *per se* rule. The USDA argues that the FMIA, PPIA and AMA are ambiguous as to what offenses qualify for withdrawal and that the department should therefore enjoy deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), to set the standards it thinks most appropriate. Under *Chevron,* we are obligated to defer to agency construction of a statute so long as the agency construction is a reasonable interpretation of the law and is not contrary to clear statutory language or Congressional intent.

We doubt whether the *per se* rule deserves the deference the agency would like. The idea of a hearing to implement a federal legislative purpose appears to require meaningful consideration of all relevant factors, many of which may not be reflected in the offenses identified in the *per se* statement of policy. *Chernin* provides an excellent example of how even certain felonious offenses—serious as they may be—do not deprive an individual of his right to a fair fitness determination. In short, we think that the *per se* rule may in some circumstances exceed the USDA's authority under the statute and impermissibly restrict the scope of evidence that the agency can hear when evaluating fitness for inspection services.

Although the USDA laudably argues that vigorous enforcement reduces threats to public health from unsafe meat inspection practice, due process always conditions regulatory goals that affect individual rights. Even without the *per se* policy, the Department can vigorously pursue enforcement of the FMIA, PPIA and AMA, while at the same time respecting individuals' right to a meaningful assessment of mitigating circumstances. In fact, as discussed below, we affirm the withdrawal of Windy City's services without relying on the *per se* policy in this case; we thus approve the ALJ's evaluation of the factors surrounding Sacks's and the Company's particular situation. The *per se* rule, on the other hand, may remove from consideration the very factors that make a hearing meaningful in evaluating fitness to receive inspection services.

Because we affirm the decision of the ALJ on the basis of non-*per se* analysis, we

do not at this time hold the rule invalid. We note, however, our doubt that the rule could be sustained in all enforcement situations.

### B. *The ALJ's Determination Beyond the* Per Se *Standard*

■ The ALJ also found Windy City unfit for inspection services independent of the *per se* rule. The JO observed that:

The ALJ properly determined that even if all of the mitigating circumstances presented by respondent [Windy City] at the hearing are considered, respondent is still, nonetheless, unfit to engage in any business requiring inspection services and unfit to receive Federal Meat grading and acceptance services.

Decision and Order at 18. This is in accord with USDA policy of making non-*per se* rule determinations in such cases. *Great American Veal*, 45 Agric.Dec. at 1850. Petitioner contends, however, that the *per se* determination "so overpowered the decision-making process that this observation cannot be taken at face value." Petitioner's Br. at 22. In other words, the ALJ was unable to evaluate the evidence before him in an unbiased manner because the *per se* rule skewed his perception of the facts.

This contention is implausible here. We review the agency's factual findings under the substantial evidence test and conclusions of law under the arbitrary and capricious standard, 5 U.S.C. § 706(2)(A), (E) (1988), and we cannot say that the determination of unfitness was incorrect. The pattern of bribery over an extended period of time gave the ALJ and JO clear indication that Windy City presents a threat to public health and safety. The bribes took place as early as 1984, evolved into a practice that the Department believed to merit investigation and resulted in an undercover investigation that demonstrated bribery to be a recurring practice at Windy City. While Sacks's personal history, reputation in the community and rehabilitation are potentially mitigating, the ALJ and JO were justified in concluding that these factors do not overpower the risk to the public of permitting a company with a his-tory like Windy City's to continue receiving federal services.

In addition, there is no indication that the hearing officers possessed a closed mind to potentially mitigating factors. Respondent's brief describes the lengths to which the ALJ went in admitting evidence that attempted to justify the bribery offense, that reflected favorably on Sacks's character and background and that described the importance of Windy City to the community. Respondent's Br. at 21–22. There is simply little to indicate that the ALJ or JO approached the non-*per se* analysis with a mindset impermissibly tainted by the *per se* rule.

Finally, the USDA's strong position that individuals convicted of bribery-related offenses during their employment are generally unfit does not demonstrate the "unalterably closed mind" that would make the hearing a sham. *See FTC v. Cement Institute*, 333 U.S. 683, 700–03, 68 S.Ct. 793, 803–05, 92 L.Ed. 1010 (1948) (even pre-hearing belief of commissioners in illegality of trade practice "did not mean that [their] minds ... were irrevocably closed on the subject"). Even if the ALJ here entered the hearing believing that the law required withdrawal for a felony conviction, Windy City had full opportunity to demonstrate why the felonies should not lead to automatic denial of services. We do not hold that the *per se* rule could never taint such a determination. However, the ALJ's non-*per se* determination here shows no evident sign of being tainted by the *per se* rule, and substantial evidence in Windy City's business history justifies the ALJ's and JO's decisions.

### C. *Due Process of the Administrative Hearing*

■ The USDA's governing statutes require a hearing in withdrawal proceedings, and the APA describes the process that is due in such a hearing. 5 U.S.C. § 554(b)-(e) (1988). Petitioner does not demonstrate how the proceeding fell short of these requirements, other than the complaint that the *per se* rule tainted the process so badly as to violate due process. We discussed

above how the *per se* rule may run afoul of the limits imposed by due process but how this does not justify reversal in this case.

Windy City also claims that the *per se* rule violates constitutional due process guarantees. Under *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the factors to be balanced in determining the extent of due process protection in administrative matters are: (1) the nature of the private interest affected by the official action; (2) the government's interest, including the fiscal and administrative burden entailed by additional procedural safeguards; and (3) the risk of error under the challenged process and the value of additional procedural safeguards.

The hearing provided Windy City easily met the minimum constitutional requirements. The ALJ provided very broad opportunities for the introduction of evidence. Petitioner has identified no mitigating factor or circumstance which he believes the ALJ and JO should have taken into account but did not. There is no evidence that the *per se* rule tainted the non-*per se* analysis. In short, Windy City enjoyed the extent of the process it was due in the USDA's review under the meat safety acts.

### III.

In sum, although we doubt that the Department's *per se* order provides adequate due process protection in all conceivable enforcement proceedings, we find that we need not assess the breadth of its legitimate application now. We affirm the denial of inspection services to Windy City on the basis of the Company's pattern of unseemly bribery practices directly compromising the conduct of meat inspection. We are precluded from independently evaluating the factual record examined by the ALJ and JO and therefore echo the sentiments of a district court in a similar proceeding:

Accordingly, the Administrative Law Judge's and Judicial Officer's reliance upon the fact of these convictions in order to find unfitness cannot be said to be arbitrary, or capricious or an abuse of discretion or in any way contrary to law. Furthermore, it cannot be said to be un-

supported by substantial evidence in the record.

Despite the seemingly severe consequences of this ruling, this court cannot set aside this agency action.

*Toscony Provision Co.,* 538 F.Supp. at 321. The order of the USDA is therefore ENFORCED.